# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALLEN SIMMONS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-2406** |
| **BURL CAIN, WARDEN** | **SECTION "I" (6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

## I. PROCEDURAL HISTORY

On August 5, 2004, petitioner, Allen Simmons, presently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana, was indicted on the charge of second degree murder.

(St. rec., vol. 1, p. 38). On August 6, 2004, Simmons entered a plea of not guilty. (St. rec., vol. 1, p. 3). On May 23, 2007, following a judge trial in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, Simmons was found guilty as charged. (St. rec., vol. 1, p. 35; St. rec., vol. 3, p. 711). On that same date, Simmons was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. (St. rec., vol. 3, p. 712).

On October 28, 2008, the Louisiana Fifth Circuit Court of Appeal affirmed Simmons' conviction and sentence. *State v. Simmons*, 996 So.2d 1177 (La. App. 5 Cir. 2008). On September 25, 2009, the Louisiana Supreme Court denied Simmons' writ application, thereby rendering his conviction and sentence final. *State v. Simmons*, 18 So.3d 81 (La. 2009).

Following the conclusion of his direct appeal proceedings, Simmons sought post-conviction relief. On May 19, 2010, the state district court denied Simmons post-conviction relief. *Simmons*, No. 2004-4083 (St. rec., vol. 10). On June 30, 2010, the Louisiana Fifth Circuit Court of Appeal likewise denied Simmons relief, providing: "[W]e do not find the district court erred in denying relator's application for post-conviction relief. Accordingly, relator's pro se writ application is denied." *Simmons v. Cain*, 2010-KH-0514 (La. App. 5 Cir. 2010) (unpublished opinion) (St. rec., vol. 10). Finally, on August 19, 2011, the Louisiana Supreme Court denied Simmons' writ application without opinion. *State ex rel. Simmons v. State*, 67 So.3d 484 (La. 2011). On September 19, 2011, Simmons filed the

instant petition for writ of habeas corpus. Simmons claims that his trial counsel was ineffective in the following respects: 1) he failed to conduct an adequate pre-trial investigation; 2) he failed to object to the introduction of prejudicial evidence; and, 3) he failed to make a request for the court to appoint a defense expert.

The State concedes, and a review of the record confirms, that the instant action is timely and that Simmons has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, this court shall review the pertinent facts and standard of review, then proceed to an analysis of Simmons' claims.

## II. **FACTS**[1]

At trial, Sylvia Williams testified that at the time of the murder in June of 2004, there were several family members living in her house at 3841 Deer Run Drive in Harvey, Louisiana. These included her daughter, Latoya Williams, her daughter, Shontrice Mosely, and her young children, her nephews, Sky and Desmond, and her 14 year old son, Irwin. The petitioner, Allen Simmons, her ex-husband, was still living with her in June of 2004.

Ms. Williams testified that on June 14, 2004, the date of the murder, she took the Simmons to work, leaving her house at 6:30 a.m. She returned home to dress for work and

---

[1] The facts are taken from the Louisiana Fifth Circuit Court of Appeal's opinion, *State v. Simmons*, 996 So.2d 1177 (La. App. 5 Cir. 2008).

before she left, Simmons returned to the house, due to rain canceling his job. Ms. Williams testified that her oldest daughter, Shontrice, drove her to work.

Shontrice Mosely testified that in 2004 she lived at 3841 Deer Run Lane. She corroborated her mother's testimony that she drove her mother to work on June 14, 2004. Ms. Mosely testified that she returned home and went back to bed. She testified that she last saw Latoya Williams on the morning of June 14, 2004, when she was preparing a bottle for her baby. Ms. Mosely testified that she left for work at about 12:15 p.m., leaving her children, her cousins, Latoya, and Simmons in the house. Ms. Mosely explained that as was her custom, she called the house later that afternoon to check on her children. She testified that she had a bad feeling because no one answered the telephone, despite her repeated calls. After making about 50 calls, her two-year old son finally answered the telephone around 4:30 p.m. Ms. Mosely returned home and saw her son in the window, crying. As she unlocked the front door with her key, she saw what she thought was a spill next to the refrigerator. Over the banister, she saw a puddle of blood.

Ms. Mosely testified that she knew something was not right so she ran to a neighbor's house and called the police, explaining that she was too scared to retrieve her children from the house. Ms. Mosely testified that while waiting outside, she saw Simmons and her cousin, Sky Cooper, walking up the street. She testified that Simmons was wearing a bloody shirt and was covered with scratches. Ms. Mosely testified that she expressed concern for Latoya

and Simmons said "I hope nothing happened to her" and "I hope she's not dead." She fell into Sky Cooper's arms and cried. The police retrieved her children from inside the house.

Desmond Williams testified that in June of 2004, he lived with his aunt, Sylvia Williams, on Deer Run in Harvey. He testified that about 4:00 a.m. on June 14, 2004, he and Sky were picked up by a van and brought to work on sanitation trucks. Sometimes he and Sky worked on the same truck; however, on this particular day they did not work on the same truck. Mr. Williams testified that when he returned home from work at approximately 1:00 p.m., he spoke briefly to Latoya. Mr. Williams testified that when he entered the hall bathroom to take a shower, he saw Simmons in the master bedroom; however, following his shower, he did not see Simmons in the house. He testified that he did not know if Simmons was still in the house when he left.

Sky Cooper testified that he also lived with his aunt, Sylvia Williams, on Deer Run during this time. He testified that he was picked up for work on the morning of June 14, 2004. He was given a ride home, but when he got to the house after work he could not get in the house. Mr. Cooper explained that he did not have a key to the house and usually the garage door was left open if no one was home. The door was locked on this particular day. Mr. Cooper testified that he sat outside to wait and saw Simmons walking in the grass, coming from the back yard. Mr. Cooper testified that Simmons looked shaken up and related that he had been robbed at knife point in the park. Mr. Cooper testified that Simmons' hand

5

was cut and he was bleeding. Mr. Cooper testified there was blood on Simmons' shirt. Simmons asked Mr. Cooper to go with him to look for the alleged robbers. Mr. Cooper explained that they did not see the robbers in the park, so they went to a convenience store to get a snack. When they returned to the house, Shontrice ran out, crying and saying that there was blood inside the house. The police were at the house. Mr. Cooper testified that he was concerned about the blood on Simmons so he asked the police to speak privately with him. Mr. Cooper testified that he told police that Simmons had been bleeding and possibly had something to do with the matter.

Deputy Terry Green testified that in 2004 he was employed with the Jefferson Parish Sheriff's Office (JPSO), and responded to an emergency call by a resident stating there was blood in a house. Deputy Green testified that upon entering the house, he saw blood in the kitchen that appeared to be "everywhere." He testified that he saw a pair of shorts and underwear near the back door and observed a trail of blood, which he followed to a closet. Deputy Green explained that as he opened the door of the closet, he saw an arm covered in blood which was underneath a pile of clothing and a blanket on the floor. The victim was covered by the blanket; she did not appear to be breathing and was not moving. Deputy Green testified that the victim was nude from the waist, wearing only socks on her feet. Deputy Green also saw blood in the master bedroom and bathroom.

Deputy Green testified that when he went outside the residence, Simmons asked to

speak to him. During this conversation, Deputy Green observed blood on Simmons' shirt and cuts on his hands. Simmons explained his cuts and bloody shirt by telling the police that he had just been injured in an armed robbery. Simmons told police that he did not report the armed robbery. Simmons was taken to the detective bureau for questioning.

Detective Jeffrey Rodrigue, the lead detective in this investigation, oversaw the collection of physical evidence at the scene, including a knife covered with what appeared to be blood. Detective Rodrigue testified that from viewing the evidence, it was clear that a struggle had taken place. A substance that appeared to be blood was seen in the foyer, hallway, kitchen, den, and on the curtains covering the sliding door in the back of the house. Detective Rodrigue identified sketches and photographs of the crime scene, as well as evidence taken from the scene on the night of the murder. These included a large kitchen knife, a pair of shorts and panties that were covered with blood, and another pair of shorts. There was a palm print on a kitchen cabinet. Due to the poor lighting, the cabinet was cut and the print was taken to the investigations bureau in order to determine if the print matched the print provided by Simmons while he was being questioned.

Detective Rodrigue testified that after he returned to the detective bureau, he was informed that the bloody palm print was a preliminary match to the print taken from Simmons. He applied for a search warrant for the body of the suspect, Allen Simmons. Rodrigue observed cuts on both of Simmons' hands. After the search warrant was granted,

police obtained a buccal swab from Simmons for purposes of DNA testing.

Virgil McKenzie, retired from JPSO, after being qualified as an expert in the field of fingerprint identification, testified that he was called to the crime scene on June 14, 2008 to give his opinion on whether fingerprints and palm prints in the home could be used for identification. He observed a bloody palm print on the kitchen counter. Due to poor lighting on the scene, this comparison could not be done on location. Crime technicians cut off the portion of the countertop for further investigation.

After comparing the prints, in his expert opinion, McKenzie concluded that the bloody palm print on the kitchen cabinet belonged to Simmons. His assistant, Lieutenant Patricia Adams, performed an independent examination and agreed with that conclusion.

Joel O'Lear, also a member of the JPSO crime laboratory, was accepted as an expert in the science of fingerprints. He used a different identification and matching process to determine that the bloody palm print matched the print on Simmons' arrest register. Mr. O'Lear, in describing the process of identifying prints, noted the "incredible amount of information in this print to make a match."

Detective Eddie Klein, JPSO, interviewed Simmons on the day of his arrest. After explaining Simmons' constitutional rights to him, Simmons waived these rights and gave a voluntary statement. In his statement, Simmons said that he left the house at 3:00 p.m. He went to the park and a "dude drawed a knife" on him and robbed him of $60.00. He told

police that when he left the house, Latoya was fine.

After the tape recorder was turned off, Detective Klein informed Simmons that the bloody palm print was his and asked him how he could deny being inside the house. In response, Simmons said he could not deny it, but did not want to talk about it. At this point, the interview was terminated.

Dr. Susan Garcia, a forensic pathologist and assistant coroner for Jefferson Parish, testified that she performed an autopsy on the body of Latoya Williams. The cause of death was multiple stab wounds. In all, there were seven stab wounds to the victim's body. The victim did not die from her wounds instantly.

Captain Timothy Scanlan of JPSO, who was qualified as an expert in crime scene reconstruction and blood stain pattern analysis, provided lengthy testimony regarding the blood splatters in the house. As a likely indicator of sexual assault, he noted that the victim's underwear and shorts were found turned inside out and left in the middle of the bloodshed. Because the victim was found, dead, in the closet, wearing only a bra, police considered that the state of the crime scene was consistent with sexual assault.

Bonnie Dubourg, of the JPSO DNA laboratory, was qualified as an expert in forensic DNA analysis and serology. She testified as to the results of DNA testing performed on evidence collected at the crime scene. The rape kit examination of the victim tested positive for seminal fluid; however, since there was no sperm in the fluid, it was not possible to

9

perform DNA testing. Swabs of physical material collected on the scene tested positive for human blood. Ms. Dubourg testified that the DNA tested from the blood on the knife and on the palm print was consistent with the victim's blood. DNA testing on a towel found in the master bedroom was consistent with the victim's blood and Simmons' blood. Ms. Dubourg testified that on every sample she tested the blood was either from the victim or from Simmons.

After the state rested, the defense presented the testimony of James McGhee, the victim's boyfriend, to support its assertion that the whereabouts of McGhee at the time of the murder could not be confirmed. Mr. McGhee testified that on the day of the murder, he worked at a body shop. He stopped at the victim's home to pick up breakfast she made for him on the way to work. He testified that he left work about 3:15 p.m. on June 14, 2004 to go to a muffler shop. He acknowledged that this time differed from that of his statement given to police wherein he stated he went to the muffler shop at 1:00 p.m. He also testified that at about 3:30 or 4:00 p.m. he left with a co-worker to get material to repair a car. Mr. McGhee testified that he left work about 7:30 or 8:00 p.m. and went to the victim's house. He gave a voluntary taped statement and buccal swap for DNA analysis. Taped statements from Mr. McGhee's co-worker and boss were admitted into evidence and corroborated Mr. McGhee's testimony.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams [v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations

omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. **ANALYSIS**

Simmons argues that trial counsel was ineffective in failing to conduct an adequate pre-trial investigation, in failing to object to the introduction of prejudicial evidence, and in failing to make a request for a defense expert. Simmons raised these same claims in his state post-conviction proceedings.

In addressing petitioner's ineffectiveness claims, the state district court first set forth applicable federal law, along with corresponding state law.

> Petitioner has a Sixth Amendment right to effective counsel. Counsel's performance will be evaluated under the well-known test of *Strickland v. Washington*, 466 U.S. 668 (1984). To be successful in arguing ineffective assistance of counsel a petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted. Both prongs of the *Strickland* test must be established before relief will be granted.
>
> There is a strong presumption that counsel's performance is within the wide range of effective representation. Effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. *State v. Soler*, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

*Simons*, No. 2004-4083, p. 1 (St. rec., vol. 10).

Thereafter, the state district court proceeded to apply the above law to Simmons' specific claims.

> A review of the court record reveals that counsel was effective and that the petitioner was not prejudiced by counsel's actions. Contradictory motion hearings were held on March 1, 2007, and May 17, 2007. Thus counsel did in fact challenge the seizure of evidence. His lack of success in suppressing this evidence does not equate to a finding of ineffectiveness. The Fifth Circuit Court of Appeal held that the seizure of evidence from the home where the victim was murdered was justified by lawful entry, followed by the plain view seizure of incriminating evidence. *State v. Simmons,* 996 So.2d at 1187.
>
> Petitioner's argument that his attorney was ineffective in failing to retain an expert for fingerprint analysis is purely speculative, as is his complaint regarding lack of investigation. His claim consists of conclusory allegations. Petitioner does not present any evidence that the outcome would be different. He does not meet either prong of the *Strickland* test. The petitioner cannot show that he was prejudiced by his counsel's performance. Thus **it was the strength of the evidence, rather than defects in counsel's performance, that led to the petitioner's conviction[].**
>
> Based upon the facts, record, and applicable statues [sic] and jurisprudence, the court determines that the petitioner has not met his burden of proof on either of the claims he raises. For this reason, he is not entitled to post-conviction relief.

*Simmons*, No. 2004-4083, p. 1 (St. rec., vol. 10) (emphasis added).

This court finds that the above analysis does not represent an unreasonable application of *Strickland* to the facts of this case. The evidence presented by the State was indeed

substantial. Simmons was clearly not prejudiced by any alleged deficiency on the part of counsel. Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Allen Simmons, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[2]

New Orleans, Louisiana, this __1st__ day of _____March_____, 2012.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[2] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.